FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (SBN 109234)
jrk@classactionlaw.com
Mark L. Knutson, Esq. (SBN 131770)
mlk@classactionlaw.com
William R. Restis, Esq. (SBN 246823)
wrr@classactionlaw.com
David J. Harris, Esq. (SBN 286204)
djh@classactionlaw.com
Trenton R. Kashima, Esq. (SBN 291405)
trk@classactionlaw.com
550 W. C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE SURREY, Derivatively On Behalf of Alibaba Group Holding Limited, <br><br> Plaintiff, <br><br> v. <br><br> JACK YUN MA, JOSEPH C. TSAI, JONATHAN ZHAOXI LU, MASAYOSHI SON, DANIEL YOUNG, CHEE HWA TUNG, WALTER TEH MING KWAUK, J. MICHAEL EVANS, and JERRY YANG, <br><br> Defendants, <br><br> -and- <br><br> ALIBABA GROUP HOLDING LIMITED, <br><br> Nominal Defendant. | Case No:  '15CV1036 WQHWVG <br><br> **CLASS ACTION** <br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff, Steve Surrey, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's derivative complaint against certain of the officers and directors, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Alibaba Group Holding Limited ("Alibaba" or the "Company"), as well as media reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a derivative action brought on behalf of all persons who purchased or otherwise acquired the securities of Alibaba between October 21, 2014 and the present, inclusive (the "Relevant Period"), against Alibaba and certain of its officers and/or directors for breach of fiduciary duty and violating Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.     Defendant Alibaba is a China-based online and mobile commerce company dealing in retail and wholesale trade, as well as cloud computing and other services. Alibaba represented that it is "the largest online and mobile commerce company in the world in terms of gross merchandise volume" in 2013. The Company hosts an online sales platform for third parties and does not engage in any direct sales, compete with merchants or hold inventory.

3.     During the Relevant Period, Defendants issued materially false and misleading statements regarding the soundness of the Company's business operations, the strength of its financial prospects and concealed substantial ongoing regulatory scrutiny. Specifically, Alibaba failed to disclose that Company executives had met with China's State Administration of Industry and Commerce ("SAlC") in July 2014, just two months <u>before</u> Alibaba's $25+ billion initial public offering in the United

COMPLAINT

States (the "lPO"), and that regulators had then brought to Alibaba's attention a variety of highly dubious – even illegal – business practices that Alibaba was actively engaged in which threatened the core aspects of Alibaba's business, including:

- The rampant sale of counterfeit goods, including fake cigarettes, alcohol, and branded handbags, by vendors on Alibaba's third-party marketplace platform;

- The sale of restricted weapons and other forbidden items on Alibaba's third-party marketplace platform;

- That Alibaba staffers had taken bribes from merchants and others seeking help to boost their search rankings and to get advertising space;

- That Alibaba ignored the practice by some vendors of faking transactions to make their sales volumes appear higher;

- That Company officials did nothing to stop merchants from using tactics such as false and misleading advertising; and;

- Accusing Alibaba of alleged anti-competitive behavior such as forbidding merchants to participate in rival sites' promotions.

4.     Prior to the disclosure of the adverse facts detailed above, Alibaba and defendants Jack Yun Ma ("Ma") and Joseph C. Tsai ("Tsai") sold more than 368 million American Depositary Shares ("ADS") in the IPO at $68 each, making more than $25 billion. Throughout the Relevant Period, Alibaba's ADS continued trading at ever-increasing, artificially inflated prices reaching a Class Period high of $120 each in intraday trading on November 13, 2014.

5.     On January 28, 2015, before the opening of trading, various members of the financial media reported that SAlC, China's main corporate regulator, had released a white paper accusing Alibaba of engaging in the illegal conduct disclosed to Alibaba executives in July 2014.

6.     On this news, the price of Alibaba's ADS dropped 4%, or $4.49 per ADS, closing at $102.94 per ADS on January 28th, on unusually high volume of approximately 42 million shares trading.

7.     Then, on January 29, 2015, before the market opened, Alibaba issued a press release announcing its financial results for the fourth quarter 2014 ("4Q 2014")

COMPLAINT

ended December 31, 2014. The Company reported revenues of just $4.22 billion for the 4Q 2014, significantly underachieving the $4.45 billion target defendants had led the investment community to expect based on Alibaba's bullish statements throughout the Class Period concerning its ongoing purported strong revenue growth. The Company also disclosed that its profits had fallen to $964 million, or 37 cents per share, a 28% decline from the financial results for the fourth quarter 2013 ("4Q 2013"), a decline Alibaba largely attributed to expenses from giving shares to employees. The Company also attributed challenges to generating revenues from transactions on its mobile platforms, where advertising is less profitable than on personal computers, and which comprised a larger percentage of sales in the quarter than in the previous quarter.

8.     As a result of these disclosures, the price of Alibaba's ADS plummeted another $8.64 per ADS to close at $89.81 per ADS on January 29, 2015, a one-day decline of approximately 9%, again on extremely unusually high volume of more than 76.3 million shares trading. The two declines collectively reduced the price of Alibaba's ADS more than 25%) from its Class Period high, erasing more than $11 billion in market capitalization.

9.     Plaintiff brings this derivative action to: (a) recover damages against Alibaba's officers and directors for the benefit of the Company; and (b) require the Company to reform and improve internal corporate governance and related procedures to protect Alibaba from repetitive instances of the type of damaging events described herein.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise in part under §14(a) of the Exchange Act, 15 U.S.C. §78n(a). Jurisdiction is conferred by the Exchange Act, and supplemental jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367.

11.     This Court has also jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a) because the plaintiff and defendants are citizens of different

3

COMPLAINT

states and the matter in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a).

12.     Venue is proper in this Court under 28 U.S.C. §1391 because nominal defendant Alibaba a substantial portion of the transactions and wrongs complained of in this action occurred in this District.

The ADS of the IPO trade on the New York Stock Exchange ("NYSE") located in this District. The roadshow used to sell the IPO took place, in large part, in the borough of Manhattan. The Company's U.S. legal counsel, the underwriters who conducted the IPO and the underwriters' counsel are all largely located in this District and carried out the IPO in this District. Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE stock market.

## PARTIES

14.     Plaintiff acquired Alibaba common stock as set forth in the attached verification that plaintiff continuously owned during the Relevant Period.

15.     Defendant Alibaba is a China-based online and mobile commerce company in retail and wholesale trade, as well as cloud computing and other services. Alibaba's ADS trade in the United States on the NYSE, an efficient market, under the ticker symbol "BABA." The Company had more than 386 million ADS issued and trading in the U.S. as of the date of its IPO.

16.     Defendant Jack Yun Ma ("Ma"), the lead founder of Alibaba is, and at all relevant time was, the Company's Executive Chairman of the Board.

COMPLAINT

17.    Defendant Joseph C. Tsai ("Tsai"), co-founder of Alibaba, is, and at all relevant time was, Executive Vice Chairman of the Board of the Company.

18.    Defendant Jonathan Zhaoxi Lu ("Lu") is, and at all relevant times was, Chief Executive Officer ("CEO") and a director of the Company.

19.    Defendant Maggie Wei Wu ("Wu") was, at all relevant times, Chief Financial Officer ("CFO") of the Company and was a signatory to Alibaba's IPO.

20.    Defendant Daniel Yong Zhang ("Zhang") is, and at all relevant times was a director of Alibaba, and was a signatory to Alibaba's IPO.

21.    Defendant Masayo Shi Son ("Son") is, and at all relevant times was, a director of Alibaba, and was a signatory to Alibaba's IPO.

22.    Defendant Chee Hwa Tung ("Tung") is, and at all times relevant was, a director of Alibaba, and was a signatory to Alibaba's IPO.

23.    Defendant Walter Teh Ming Kwauk ("Kwauk") is, and at all times relevant was, a director of Alibaba, and was a signatory to Alibaba's IPO.

24.    Defendant J. Michael Evan ("Evan") was a former vice chairman of Goldman Sachs Group, Inc. and at all times relevant was, a director of Alibaba, and was a signatory to Alibaba's IPO.

25.    Defendant Jerry Yang ("Yang") is, and at all times relevant was, a director of Alibaba, and was a signatory to Alibaba's IPO.

26.    The defendants referenced above in ¶¶ 16-25 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements which caused the prices of Alibaba's ADS to be artificially inflated during the Class Period.

27.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Alibaba's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be

misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

28.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Alibaba and the adequacy of its internal controls. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Alibaba's ADS was a success, as it: (i) deceived the investing public regarding Alibaba's prospects and business; (ii) artificially inflated the prices of Alibaba's ADS; (iii) permitted Alibaba and the selling shareholders to raise more than $25 billion in the IPO and Alibaba to raise more than $8 billion in its Class Period private debt placement; and (iv) caused plaintiff and other members of the Class to purchase Alibaba's ADS at inflated prices.

## BACKGROUND

29.    Alibaba, founded in 1999, is a China-based online and mobile commerce company in retail and wholesale trade, as well as cloud computing and other services. The Company provides technology and services to enable consumers, merchants, and other participants to conduct commerce in what it calls its "ecosystem." The Company operates Taobao Marketplace, an online shopping destination, Tmall is a third-party platform for brands and retailers and Juhuasuan. The Company represents that it provides the fundamental technology infrastructure and marketing reach to help businesses leverage the power of the Internet to establish an online presence and conduct commerce with consumers and businesses.

30.    In July 2014, two months before its IPO, Alibaba executives met with

COMPLAINT

China's SAIC during which meeting the regulators brought to Alibaba's attention a variety of highly dubious even illegal -business practices that the SAIC advised Alibaba it was then actively clamping down on and which threatened the core of Alibaba's business, including:

- The rampant sale of counterfeit goods, including fake cigarettes, alcohol and branded handbags, by vendors on Alibaba's third-party marketplace platform;

- The sale of restricted weapons and other forbidden items on Alibaba's third-party marketplace platform;

- That Alibaba staffers had taken bribes from merchants and others seeking help to boost their search rankings and to get advertising space;

- That Alibaba ignored the practice by some vendors of faking transactions to make their sales volumes appear higher;

- That Company officials did nothing to stop merchants from using tactics such as false and misleading advertising;

- Accusing Alibaba of alleged anti-competitive behavior such as forbidding merchants to participate in rival sites' promotions;

These facts were never disclosed to the investing public prior to the IPO.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING PRE-CLASS PERIOD STATEMENTS THAT REMAINED LIVE AND UNCORRECTED IN THE MARKET THROUGHOUT THE CLASS PERIOD AND CLASS PERIOD MISSTATEMENTS**

31.    On May 6, 2014, Alibaba filed with the Securities and Exchange Commission ("SEC") a Registration Statement on Form F1, which would later be utilized for the IPO following several amendments in response to comments by the SEC. Each of the Individual Defendants signed the Registration Statement. On September 18, 2014, the SEC declared the Registration Statement effective. On or about September 19, 2014, Alibaba priced the IPO at $68 per ADS and filed the final Prospectus for the IPO on September 22, 2014, which forms part of the Registration Statement (collectively, the "Registration Statement").

32.    Concerning the purported integrity of Alibaba's third-party marketplace portal-or its "growing ecosystem" -and the legitimacy of the products being sold there, the Registration Statement stated in pertinent part as follows:

COMPLAINT

***We have been a leader in developing online marketplace standards in China***. Given the scale we have been able to achieve, an ecosystem has developed around our platforms that consists of buyers, sellers, third-party service providers, strategic alliance partners, and investee companies. Our platform and the role we play in connecting buyers and sellers and making it possible for them to do business anytime and anywhere is at the nexus of this ecosystem. ***Much of our effort, our time and our energy is spent on initiatives that are for the greater good of the ecosystem and the various participants in it***. We feel a strong responsibility for the continued development of the ecosystem and we take ownership for this development. Accordingly, we refer to this as "our ecosystem."

***Our ecosystem has strong self-reinforcing network effects that benefit our marketplace participants, who are invested in our ecosystem's growth and success. Through this ecosystem, we have transformed how commerce is conducted in China and built a reputation as a trusted partner for the participants ill our ecosystem.***[1]

33.    Emphasizing the Company's purportedly "Trusted Brands," the Registration Statement highlighted as a "Competitive Strength" that "Alibaba, Taobao, Tmall [were] well recognized and trusted brands in China," that "[d]ue to the strength of these brands, a majority of [its] customers navigate[d] directly to [its] China retail marketplaces to find the products and services they [were] seeking instead of via third-party search engines."

34.    The Registration Statement also emphasized the Company's "***Thriving Ecosystem with Powerful Network Effects***," stating that it was "the steward of a thriving ecosystem, which provide[d] [it] with [certain] key advantages," including that "***interactions among participants create[d] value for one another as [its] ecosystem expand[ed] and generate[d] strong network effects.***"

35.    The Registration Statement further emphasized the Company's "Data Insights" and "Third-party Platform Business Model" as competitive strengths, stating in pertinent part as follows:

- *Data Insights*. Data from consumer behavior and transactions completed on our marketplaces and interactions among participants in our ecosystem ***provide us with valuable insights to help us and our sellers improve the buyer experience,*** operate more efficiently and create innovative products and services.

---

[1]Emphasis added unless otherwise noted.

COMPLAINT

- ***Third-party Platform Business Model***. Our exclusively third-party platform business model allows us to scale rapidly ***without the risks and capital requirements of sourcing, merchandising and holding inventory borne by direct sales companies***. This business model drives ***our profitability and strong cash flow***, which give us the flexibility to further invest in and improve our platform, expand our ecosystem and aggressively invest in people, technology, innovative products and strategically important assets.

36.     Concerning ongoing revenue growth purportedly then being experienced, and importantly that which could be expected in the Company's 4Q 2014, the Registration Statement stated, in pertinent part, as follows:

Due to promotional events and higher consumer spending in the quarters ended June 30 and December 31, merchants are inclined to allocate more of their marketing spending during these periods to compete for and attract this consumer spending, ***which therefore drives revenue growth during those periods*** disproportionately to GMV growth and because ***increased demand for such services also increases pricing***.

37.     Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, including any known trends, issuers are required to disclose events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. Prior to the lPO, Alibaba and SAlC had met and the Company was advised that Alibaba was engaging in a number of improper and/or illegal business practices. The adverse events and uncertainties associated with this meeting and the practices discussed at the meeting were reasonably likely to have a material impact on Alibaba's continuing operations and, therefore, were required to be disclosed in the Registration Statement but were not.

38.     Defendant Ma emphatically denied at the time of the IPO that Alibaba would undertake any untoward business practices to increase sales to the detriment of reputation, telling CNBC on September 19, 2014 that he had "always believe[d] that customer is number one, employee number two and shareholders are number three." Refuting that he would ever take action to drive up stock prices to the detriment of customers, he told The Independent on September 22, 2014 that "[f]or me, the price, up and down, my people worry about that. I want to make the customer happy.  On

9

September 17th he told Charlie Rose: "I have said on numerous occasions that we will put customers first, employees second and shareholders third." I can see that investors who hear this for the first time may find it a bit hard to understand. Let me be clear: as fiduciaries of the company, we believe that the only way for Alibaba to create long-term value for shareholders is to create sustainable value for customers. So customers must come first." On the 60 Minutes show in late September 2014, Ma proclaimed: "If you want to invest in us, we believe customer No.1, employee No.2, shareholder No.3. If they don't want to buy that, that's fine. If they regret, they can sell us."

39.     On November 4, 2014, before the market opened, Alibaba issued a press release announcing its financial results for the 3Q 2014 ended September 30,2014. The Company reported net income of $494 million, or 20 cents per share, on revenues of $2.7 billion. Concerning the strength of the Company's ongoing business, the press release stated, in pertinent part, as follows:

> "We delivered a strong quarter with significant growth across our key operating metrics," said Jonathan Lu, chief executive officer of Alibaba Group. *"Our business continues to perform well, and our results reflect both the strength of our ecosystem and the strong foundation we have for sustainable growth*. On our China retail marketplaces, gross merchandise volume for the quarter increased 490/0 and annual active buyers increased 52% year on year. We extended our unrivaled leadership in mobile with 217 million monthly active users on our mobile commerce apps in September and US$95 billion in mobile GMV for the twelve months ended September 2014. *We are also encouraged by continued improvement of mobile monetization which demonstrates the strong commercial intent of our users."*
>
> "Our financial performance this quarter was robust, with revenue growing 54% year on year," said Maggie Wei Wu, chief financial officer of Alibaba Group. *"We continue to execute our focused growth strategy, and the fundamental strength of our business gives us the confidence to invest in new initiatives to add new users improving engagement and customer experience, expand our products and services and drive long-term shareholder value."*

40.     Later that day, Defendants Tsai, Lu and Wu conducted a call with investors to discuss the quarterly financial results, making additional positive statements about the strength of the Company's ongoing business metrics and financial prospects.

COMPLAINT

41.     On November 11, 2014, the Company issued a press release entitled "Alibaba Group Generated US$2 Billion in GMV in First Hour of 11.11 Shopping Festival," highlighting that the sales had greatly exceeded expectations in the annual event.

42.     On November 11, 2014, Defendant Ma was also interviewed by CNBC's David Faber on "Squawk on the Street." Concerning the importance of the Company's good reputation and not chasing sales to increase the stock price at the cost of damaging reputation, Defendant Ma emphasized that Alibaba always put its customers' best interests before the stock market's perception of Alibaba's profitability and worth, stating in pertinent part as follows:

> JACK MA: --YOU KEEP--YOU TRY TO KEEP THE PEOPLE YOU TRUST, AND THEY TRUST IN YOU, HAPPY. 'CAUSE I CANNOT MAKE EVERY SHAREHOLDER HAPPY. ***THE SHAREHOLDER HAS TO UNDERSTAND THIS COMPANY HAVE A STRANGE UNIQUE PHILOSOPHY. . WE ARE BUILDING ON A BUSINESS MODEL THAT'S A ECOSYSTEM***. NOBODY EVER HEARD OF THAT. ***WE'RE FOCUSING ON HELPING CUSTOMERS, SMALL BUSINESS.*** WE'RE FOCUSING ON MAKING SURE THAT EMPLOYEE HAPPIES AND THEN THE SHAREHOLDER.
>
> DAVID FABER: AND SO--IF I HAVE TO ASK YOU TO DESCRIBE THE CULTURE OF ALIBABA, WHAT IS IT? IS IT THAT?
>
> JACK MA: ***TRUST AND TRANSPARENT***. 'CAUSE WE ARE WORKING WITH--MY COMPANY AND THE TEAM HAVE--WE HAVE 30 THOUSAND SMART PEOPLE. ***IF YOU WORK WITH THE SMART PEOPLE, YOU GOTTA BE TRANSPARENT. YOU GOTTA MAKING SURE THEY TRUST YOU AND YOU TRUST THEM AND MAKING SURE THAT EVERYBODY HAVE THE SAME VISIONAND VISION AND VALUE. AND THESE ARE THE CORE***. 'CAUSE THEY'RE SO SMART. IT SI SOMETIMES GREAT TO WORK WITH THE STUPID GUYS, WHATEVER YOU SAY, THEY'LL FOLLOW IT. BUT IT'S A GOOD PAIN IF THEY--IF YOU ARE SMART THAN THEM-IT IS A DISASTER

43.     Then on November 12, 2014, the Company issued a release entitled "Alibaba Group Generated US $9.3 Billion in GMV on 11.11 Shopping Festival" Mobile GMY Accounted for 42.6%." This release further emphasized the purportedly strong quarter the Company was then having, stating, in pertinent part, as follows:

> "On behalf of our entire ecosystem -from millions of buyers and merchants both here and abroad -we are very happy with the results of

COMPLAINT

this year's 11.11 shopping festival," said Jonathan Lu, CEO of Alibaba Group. "*We are particularly encouraged by tile growing trend of consumers embracing mobile shopping on a global stage.* Alibaba is humbled to play a role in making it easy for people to do business anywhere. "

The 11.11 Shopping Festival ("11.11") began in 2009 with 27 merchant participants as an event for Tmall.com merchants and consumers to raise awareness of the value in online shopping. *This year, more than 27,000 brands and merchants participated in tire event, including Costco, Muji, Desigual, ASOS, and Tire North Face. By expanding globally with the participation of AliExpress and Tmall Global, consumers from over 217 countries and regions were able to select from more titan one million products through online storefronts and e-commerce websites.*

44.     On November 13, 2014, the Company issued a press release stating that it was going to offer Senior Unsecured Notes (the "Notes"). On November 21, 2014, the Company announced the following pricing of the Notes which would be sold to the U.S. investing public in an offering exempt from registration under the federal securities laws for a total of $8 billion:

- US $300 million floating rate notes due 2017 at an issue price per note of 100.000%;

- US $1,000 million 1.625% notes due 2017, at an issue price per note of 99.889%;

- US $2,250 million 2.500% notes due 2019 at an issue price per note of 99.618%;

- US $1,500 million 3.125% notes due 2021 at an issue price per note of 99.558%;

- US $2,250 million 3.600% notes due 2024 at an issue price per note of 99.817%; and,

- US $700 million 4.500% notes due 2034 at an issue price per note of 99.439%.

45.     The Notes were priced favorably to Alibaba based on its then present strong corporate debt ratings.

46.     On December 8, 2014, the Company issued a press release entitled

COMPLAINT

1   "Alipay 2014 Spending Report Sheds Light on Chinese Online Spending Behavior."

2   Alipay was launched in 2004 as part of the Alibaba Group's "ecosystem" and provides

3   the Company's online payment services. The release stated, in pertinent part, as

4   follows:

5    Alipay, China's largest online payment service provider, marks its 10-
 year anniversary today with the release of its Annual Spending Report,
6    highlighting the development of online economic activity and consumer
 behavior of Chinese Internet users over the past decade (2004 through
7    October 31, 2014). ***According to tire report, the availability of online
 payment services has played a major role in making goods and services***
8   *** widely accessible throughout Chinese society, especially in less-
 developed interior provinces and counties where people now enjoy***
9   *** equal access to branded products at the same prices as those living in
 first and second tier cities.***

10          * * *

11

12    Meanwhile, with ongoing advances in mobile Internet technology,
 ecommerce in China continues to shift from desktop PCs to smartphones
13    and other mobile devices. From 2012 to 2014, the proportion of mobile
 payments to total payments in some of the country's less-developed
14    regions more than doubled, ***indicating consumers in rural areas and
 smaller cities are quickly adopting mobile devices as their primary tool***
15   *** for online shopping as more people in China have access to mobile
 devices and smartphones.***

16     47. On December 23, 2014, the Company issued a press release entitled

17   "2014 Counterfeit Report Press Conference -Speech By Jonathan [Zhaoxi] Lu, CEO

18   of Alibaba Group -Hangzhou, China, December 23, 2014." The release claimed

19   Alibaba was actively monitoring and deterring counterfeit sales on its platform and

20   other fraudulent activity, stating, in pertinent part, as follows:

21    Ever since the founding of Alibaba Group in 1999, it has been our
 mission to make it easy to do business anywhere. ***This ease of doing***
22   *** business must be facilitated by trust. We believe that trust is the basis
 for wealth and that trust is an important currency that makes our e-***
23   *** commerce platforms tick. All the work that we have done over the past
 15 years underscores this belief***.

24   *** Since the establishment of Taobao in 2003, Alibaba Group has***
25   *** constantly fought to protect the interests of consumers in the Internet
 space and together with, our valued government partners, we have***
26   *** made great strides in addressing this issue.***

27    However counterfeiting is a global problem and one that we need to face
 together as a society. From Alibaba Group's perspective, we bear a
28    serious responsibility in this fight against counterfeits. Jack Ma said
 yesterday if e-commerce does well in China, that may have little to do

with Alibaba Group, but if counterfeits in society are not tackled effectively, it has a lot to do with Alibaba Group.

*In our years of combating this problem, we have built cooperative relationships with various government bodies to combat counterfeiting at its source in order to safeguard the interests of consumers. We have built systems and services like Alipay that are based on trust and are there to protect the consumer because in the end, counterfeiting hurts Alibaba Group as consumers who receive fake goods may no longer want to shop on our platforms.*

*Thankfully, Internet technology has made it easier for transactions to be traced. This means that by analyzing transaction data we call trace counterfeiters who sell online. Through the analysis of big data, online sources of counterfeit products can be tracked offline, making it easier to enforcement authorities to do their work.*

Secondly, we believe that protecting customer rights and combating counterfeits should be a long-term and persistent goal. To achieve that, support needs to come from all levels of society. *Through tile years, Alibaba Group has become more effective at protecting consumer rights and combating counterfeits. According to the latest data available, only 3.5 transactions in every 10,000 transactions received customer complaints, 22% decline from last year.*

Effectively combating the counterfeiting issue requires the active involvement from different government agencies and authorities, as the root of the counterfeit problem is offline. *By collaborating with China's Public Security Bureau, the General Administration of Quality Supervision, China's State Intellectual Property Office and State Administration of Press, Publication, Radio, Film and Television and leveraging new tools such as the Internet and big data, Alibaba hopes that these measures will be impactful in combating fakes in the real world. We hope that by exposing counterfeiters and supporting the fight in a long-term fashion, fakes can be eliminated one day.*

48.    On January 8, 2015, the Company issued a press release entitled "Alibaba and Microsoft Collaborate To Improve Online Customer Experience, Creating a Safer Internet." The release again claimed Alibaba was actively monitoring and deterring counterfeit sales on its platform and other fraudulent activity, stating in pertinent part as follows:

"*Alibaba Group takes the issue of IPR infringement very seriously and we are constantly working with partners and stakeholders to enhance IPR protection on our platforms in order to tackle the problem of counterfeiting effectively,*" said Ni Liang, Alibaba Group's Senior Director of Security Operations.

49.    The true facts, which were known by the Individual Defendants throughout the Class Period, but were not disclosed to the investing public were as

COMPLAINT

1    follows:

2           a)    the Company was engaged in a proliferation of unscrupulous – if

3    not illegal – business practices;

4           b)    Chinese regulators had brought the Company's unscrupulous

5    business practices to its attention in July 2014 as part of their efforts to increase

6    enforcement of consumer protection laws in China, exposing the Company fines,

7    penalties and damage to reputation; and

8           c)    Alibaba's 4Q 2014 sales growth was declining as a result of its

9    unscrupulous business practices.

10          50.    On January 28, 2015, before the opening of trading, various members of

11   the financial media reported that SAIC, China's main corporate regulator, had released

12   a "white paper" accusing Alibaba of engaging in the illegal conduct disclosed to

13   Alibaba executives in July 2014. Specifically, it was disclosed that in July 2014, two

14   months prior to the lPO, regulators had brought to Alibaba's attention a variety of

15   highly dubious even illegal business practices that the IPO failed to properly disclosed.

16   Alibaba was then actively clamping down on and which threatened the core of

17   Alibaba's business, including:

18          • The rampant sale of counterfeit goods, including fake cigarettes,
19            alcohol and branded handbags, by vendors on Alibaba's third-party
               marketplace platform;

20          • The sale of restricted weapons and other forbidden items on Alibaba's
               third-party marketplace platform;
21
22          • That Alibaba staffers had taken bribes from merchants and others
               seeking help to boost their search rankings and to get advertising
23            space;

24          • That Alibaba ignored the practice by some vendors of faking
               transactions to make their sales volumes appear higher;
25
            • That Company officials did nothing to stop merchants from using
26            tactics such as false and misleading advertising; and

27          • Accusing Alibaba of alleged anticompetitive behavior such as
               forbidding merchants to participate in rival sites' promotions.

28          51.    As reported by the *Wall Street Journal* on January 28th, whose reporters

15

COMPLAINT

had reviewed the SAIC white paper before it was removed from SAIC's website:

> The Chinese government accused e-commerce giant Alibaba of falling to crack down on the sale of fake goods, bribery and other illegal activity on its sites in a rare public dispute with one of the country's most prominent companies.

> ***

> Alibaba has long grappled with allegations that Taobao, its biggest ecommerce platform, is rife with counterfeit goods. ***The accusations from the Chinese government could lend further force to those complaints and damage Alibaba's reputation among investors and brands overseas, while the highly public spat could hurt the company's relationship with the government, experts warn***.

> The government's accusations are in a white paper made public on Wednesday by China's State Administration for Industry and Commerce, ***but based on conversations between the agency and Alibaba officials in July***. That was two months before Alibaba's U.S. IPO, which valued the Chinese company at more than $230 billion. ***In the paper, the agency said it held off on disclosing details of the talk so as not to affect the IPO.***

> ***

> ***The report said the problems had grown to become Alibaba 's "greatest credibility crisis" since the company was established. Citing a Chinese phrase that refers to letting a small problem fester, the paper said, "for a long time, [Alibaba[ didn't pay sufficient attention to the issue and didn't bane of its life."***

52.     On this news, the price of Alibaba's ADS dropped 4%, or $4.49 per ADS, closing at $102.94 on January 28, 2015 on unusually high volume of approximately 42 million shares trading.

53.     Then, on January 29, 2015, before the market opened, Alibaba issued a press release announcing its financial results for the fourth quarter 2014 ended December 31, 2014. The Company reported revenues of just $4.22 billion for the 4Q 2014, significantly under-achieving the $4.45 billion target defendants had led the investment community to expect based on Alibaba's bullish statements throughout the Class Period concerning its ongoing strong revenue growth. The Company also disclosed that its profits had fallen to $964 million, or 37 cents per share, a 28% decline from the 4Q 2013, a decline Alibaba largely attributed to expenses from giving shares to employees. The Company also attributed challenges generating revenues from transactions on its mobile platforms, where advertising is less profitable than on

COMPLAINT

personal computers, and which comprised a larger percentage of sales in the quarter than in the previous quarter.

54.    As a result of these disclosures, the price of Alibaba's ADS plummeted another $8.64 per ADS to close at $89.81 per ADS on January 29, 2015, a one-day decline of approximately 9%, again on unusually high volume of more than 76.3 million shares trading. The two declines collectively reduced the price of Alibaba's ADS more than 25% from its Class Period high, erasing more than $11 billion in market capitalization.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

**A.    Fiduciary Duties**

55.    By reason of their positions as officers, directors, and/or fiduciaries of Alibaba and because of their ability to control the business and corporate affairs of Alibaba, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Alibaba in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Alibaba and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

56.    Each director and officer of the Company owes to Alibaba and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**B.    Audit Committee Duties**

57.    In addition to these duties, members of the Audit Committee owed

COMPLAINT

specific duties, under the Audit Committee's Charter to review and approve quarterly and annual financial statements, earnings press releases, and the Company's internal controls over financial reporting. Some of the Audit Committee's responsibilities included:

1. Review the annual audited financial statements with management and the independent auditor, including the Company's disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations, significant issues and judgments regarding accounting and auditing principles and practices, and the effect of regulatory and accounting initiatives on the Company's financial statements, and recommend to the Board whether the financial statements should be included in the Form 10-K. The review of the annual audited financial statements also includes a review of any transactions as to which management obtained a letter pursuant to Statement on Auditing Standards No. 50.

2. Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to filing the Form 10-Q, including the results of the independent auditor's review of them and the Company's disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations.

3. Review major issues and changes to the Company's auditing and accounting principles and practices as suggested by the independent auditor, internal auditors or management, and analyses setting forth significant financial reporting issues and judgments, including analyses of the effects of alternative GAAP methods on the financial statements, and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

4. Discuss policies with respect to risk assessment and risk management, including appropriate guidelines and policies to govern the process, as well as the Company's major financial and business risk exposures and the steps management has undertaken to monitor and control such exposures.

**C.     The Code of Ethics For Senior Financial Officers**

58.     The Company's executive officers owed specific duties under the Company's Code of Ethics.  The duties included:

1. The CEO and all Senior Financial Officers are responsible for full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company. Accordingly, it is the responsibility of the CEO and each Senior Financial Officer promptly to bring to the attention of the General Counsel or the CEO any material information of which he or she may become aware that affects the disclosures made by the

18

Company in its public filings.

2. The CEO and each Senior Financial Officer shall promptly bring to the attention of the General Counsel or CEO any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

3. The CEO and each Senior Financial Officer shall act with honesty and integrity in the performance of his or her duties at the Company, shall comply with laws, rules and regulations of federal, state and local governments and other private and public regulatory agencies that affect the conduct of the Company's business and the Company's financial reporting.

4. The CEO and each Senior Financial Officer shall promptly bring to the attention of the General Counsel or the CEO any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or any violation of this Code of Ethics.

## D.     Control, Access, and Authority

59.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Alibaba, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the public statements issued by Alibaba.

60.    Because of their advisory, executive, managerial, and directorial positions with Alibaba, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Alibaba.

61.    At all times relevant, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Alibaba, and was at all times acting within the course and scope of such agency.

## BREACHES OF DUTIES

62.    The conduct of the Individual Defendants complained of herein involve a knowing and culpable violation of obligations as directors and officers of Alibaba, the

COMPLAINT

absence of good faith on their part, and a reckless disregard for their duties to Alibaba and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to Alibaba.  The conduct of the Individual Defendants who, were also officers and/or directors of the Company were ratified by the remaining Individual Defendants who, collectively, comprised the entire Alibaba Board.

63.    The Individual Defendants each breached their duty of loyalty and good faith by causing the Company to issue false statements about Alibaba and by misrepresenting the Company's financial results and prospects.  In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws. As a result, Alibaba has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

64.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their liability. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.    During all relevant times, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal that the Company was issuing false and misleading statements about the source of Alibaba's actual revenues. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

66.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue false and misleading statements regarding Alibaba's financial results.

COMPLAINT

67.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

68.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

69.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### DAMAGES TO ALIBABA

70.    The Individual Defendants' wrongful conduct was the direct and proximate cause of damages Alibaba has suffered, and will suffer.

71.    The Individual Defendants failed to disclose that the Company was issuing false and misleading statements about the source of Alibaba's revenues caused by the improper statements and omissions have devastated Alibaba's credibility. Alibaba is now the subject of a class action lawsuit, alleging violations of securities laws in connection with the improper financial reporting, false statements, and material omissions. The Company will face substantial costs, expenses, and a potential adverse verdict in connection with that lawsuit. Alibaba's rampant sale of counterfeit goods, restricted weapons and other forbidden items on the Company's third-party

COMPLAINT

market place platform; common place bribery from merchants to boost the sale of their goods; and misbooking/misrepresenting the booking sales to make Alibaba's sales volume appear higher than represented in the Company's public filings.

72.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Alibaba's market capitalization and borrowing capacity has been substantially damaged.

73.     Further, as a direct and proximate result of the Individual Defendants' conduct, Alibaba has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending Alibaba and certain officers in securities class action lawsuit filed again Alibaba on February 3, 2015 in the United States District Court for the Southern District of New York, Case No. 15-cv-0811-UA, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on Alibaba's artificially-inflated stock price and inflated growth prospects;

(c)     costs incurred from the loss of the Company's customers' confidence in Alibaba's products; and

(d)     damages to the Company due to the false and misleading financial statements that the Individual Defendants caused the Company to file.

74.     Moreover, these actions have irreparably damaged Alibaba's image and goodwill. For at least the foreseeable future, Alibaba will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Alibaba's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE ALLEGATIONS

75.     Plaintiff Surrey brings this action derivatively on behalf and for the benefit of the Company to remedy the wrongdoing by the Defendants as alleged

COMPLAINT

herein. Plaintiff brings this action for the benefit of Alibaba to redress injuries suffered, and yet to be suffered by Alibaba, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. Alibaba is named in this action as a Nominal Defendant solely in a derivative capacity.

76.     Plaintiff will fairly and adequately represent the interests of the Company and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

77.     This action is not a collusive one to confer jurisdiction on a court that it would not otherwise have.

78.     Plaintiff did not make a demand on the Board to bring this action because such demand would be futile given the facts as alleged herein and, therefore, such a demand is excused.

79.     Alibaba is controlled by its Board of Directors, which currently consists of the following individuals: Ma, Tsai, Lu, WU, Son Zang, Tung, Kwauk, Evans, and Yang. The directors are named as defendants in this lawsuit and engaged in wrongful acts alleged herein. Thus, they are not disinterested and cannot exercise independent business judgment on the issue of whether Alibaba should prosecute this action. As a result, demand on Alibaba and its Board is futile and therefore excused.

**A.     Demand Is Futile As To The Directors**

80.     The Director Defendants face a substantial likelihood of liability for disregarding and allowing the Company to continue to illegally promote Alibaba's common stock.

81.     Company was issuing false and misleading statements about its online and mobile commerce and retail services and cloud computing services, and by not disclosing the SAIC investigation and disclosure to Alibaba's Board in July 2014 disclosing numerous improper and illegal activities. Thus, the Individual Defendants ignored the false statements in violation of their fiduciary duties and/or failed to take

23

COMPLAINT

any action to correct the false statements. Accordingly, the Individual Defendants filed a substantial likelihood of liability for breaching their fiduciary duties to the Company, rendering any demand upon them futile.

**B.    Demand Is Futile As To Audit Committee Defendants**

82.    Defendants Ma, Tsai, Lu, WU, Son Zang, Tung, Kwauk, Evans and Yang were members of Alibaba's Audit Committee when the false and misleading statements were being disseminated. The Audit Committee is required to oversee the accuracy of Alibaba's financial reporting to insure the investing public is provided with accurate financial information. Despite these duties, the Audit Committee members issued and/or approved the false and misleading statements that failed to disclose that (a) Alibaba repeatedly failed to report that Companies rampant sale of counterfeit goods by vendors on the Company's third party internet platform; (b) the sale of forbidden products on the Company's website; (c) the multiple bribes for products on its website; and, (d) other rival websites.

83.    As a result of (a) their access to and review of internal corporate documents; (b) conversations and connections with other corporate officers, employees and directors; and (c) attendance at management and Board meetings, each of the members of the Audit Committee knew the adverse non-public information regarding Alibaba's business, operations, and management related to its products and services and the SAIC notification to the Company in July, 2015 that cited numerous improper and/or illegal acts committed by the Company. Indeed, each of the members of the Audit Committee knew of the wrongdoing complained herein. Thus, the Individual Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile, and Defendant's refusal to investigate or address these was these two entertwinded activities.

**D.    Demand Is Futile As To All Of The Director Defendants**

84.    If Alibaba's officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties

COMPLAINT

alleged in this Complaint by Directors Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.* , monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Alibaba against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Board of Directors were to sue themselves or certain of the officers of Alibaba, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Board of Directors cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O insurance policy.

85.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Alibaba by prosecuting this action. Therefore, demand on Alibaba and its Board is futile and is excused.

86.    Alibaba has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Board of Directors has not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the directors are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Derivative Claim Against Defendants
### for Violation of Section 14(a) of the Exchange Act.

87.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

88.     Defendants Ma, Tsai, Lu, WU, Son Zang, Tung, Kwauk, Evans, and Yang who were Alibaba's directors at the time, issued, caused to be issued, and participated in the issuance of materially false and misleading written statements and material omissions to shareholders that were contained in the Company's 2014 Form F-1 Registration Statement. The 2014 Registration Statement soliciting materials failed to disclose to the Company's shareholders that these Defendants had caused the Company to file materially false and misleading statements about the source of revenues and that the Company was improperly promoting and marketing of its products and services. By reasons of the conduct alleged herein, these Defendants who caused the issuance of the 2014 Form F1 Registration violated Section 14(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, the Company misled and/or deceived its shareholders by falsely portraying the operations of the Company.

89.     Plaintiff, on behalf of the Company, thereby seeks relief for damages inflicted upon the Company in connection with the misleading and incomplete proxy materials. Alibaba is entitled to recover damages to compensate the Company for all damages resulting from the Defendants' acts and omissions in violation of Rule 14a-9.

## COUNT II

### Breach of Fiduciary Duty Against All Individual Defendants

90.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.     The Individual Defendants owed and owe Alibaba fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Alibaba the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

92.     The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, and due care.

93.     The Individual Defendants each knowingly, recklessly or negligently

COMPLAINT

signed or approved the issuance of false and misleading statements and allowed the Company to market purposes. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

94.     As a direct and proximate result of these Individual Defendants' failure to perform their fiduciary obligations, Alibaba has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

95.     Plaintiff, on behalf of Alibaba, has no adequate remedy at law.

## COUNT III

### Waste of Corporate Assets Against All Individual Defendants

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

98.     As a result of the misconduct described above, the Individual Defendants have caused Alibaba to incur substantial legal liability as the Company will incur significant legal costs defending itself as a result of the Individual Defendants' misconduct and unlawful actions.

99.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

100.   Plaintiff, on behalf of Alibaba, has no adequate remedy at law.

## COUNT IV

### Unjust Enrichment Against the Individual Defendants

101.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

COMPLAINT

102.   The Individual Defendants were unjustly enriched at the expense of the Company by receiving incentive compensation based on the stock performance of Alibaba.

103.   To prevent the Individual Defendants' unjust enrichment, the Court should order these Individual Defendants to disgorge to the Company all the proceeds they received from their wrongful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of Alibaba, prays for relief and judgment as appropriate as follows:

A.   A determination that this suit is a proper derivative action and certifying Plaintiff as an appropriate representative of Alibaba for this action;

B.   A declaration that each of the Defendants breached his or her fiduciary duties to Alibaba and violated Section 14(a) of the Exchange Act;

C.   A determination and award to Alibaba for the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

D.   A declaration that the Company must undertake necessary corrective actions to reform and improve its corporate governance and internal procedures in order to protect the Company from a repeat of the damaging events described in this Complaint, including but not limited to, adopting the following remedial measures:

1.   Strengthening the Board's supervision through strong accountability measures to ensure the Board accurately discloses the Company's business prospects;

2.   Adopt a process allowing the Company's shareholders to nominate at least two new candidates for election to the Board; and

3.   Modifying the Company's share repurchase program.

E.   An award to Plaintiff for the costs and disbursements of this action, including reasonable fees and costs to Plaintiff's attorneys and experts; and

COMPLAINT

1       F.     Such other and further relief as the Court may deem just and proper.

2                    **JURY TRIAL DEMANDED**

3    Plaintiff demands a trial by jury.

4                           Respectfully submitted,

5                           FINKELSTEIN & KRINSK LLP

6

7  Dated: May 8, 2015         By:  /s/ Jeffrey R. Krinsk

                                  Jeffrey R. Krinsk

8                          Mark L. Knutson

9

10                      Counsel for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

**VERIFICATION**

I, Steve Surrey, I am the named Plaintiff in this action.  I am authorized to make this verification on behalf of myself and hereby verify that I have at all times material am a shareholder of Alibaba Group Holding Limited.  I am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true.  As to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:       May 8, 2015



Steve Surrey,

COMPLAINT

